1

2

3

4

5

6

7

8                         UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    JOSEPH LAKE,                              No. 2:19-cv-01439-DAD-CSK

12                    Plaintiff,

13          v.                                  ORDER GRANTING IN PART AND
                                                DENYING IN PART DEFENDANTS'
14    CITY OF VALLEJO, et al.,                  MOTION FOR SUMMARY JUDGMENT

15                    Defendants.               (Doc. Nos. 160, 165, 166)

16

17

18          This matter is before the court on the motion for summary judgment filed on behalf of

19    defendants City of Vallejo, City of Vallejo Police Department, City Council of the City of

20    Vallejo, Officer Anthony Romero-Cano, Officer Travis Aspegren, Sergeant Theodore Postolaki,

21    and Officer Nichols (collectively, "defendants"). (Doc. No. 160.) The pending motion was taken

22    under submission on October 31, 2024. (Doc. No. 162.) For the reasons explained below,

23    defendants' motion for summary judgment will be granted in part and denied in part.

24    /////

25    /////

26    /////

27    /////

28    /////

                                                    1

**BACKGROUND**

**A.    Factual Background[1]**

On July 27, 2018, at approximately 4:45 p.m., a 911 caller reported a shooting in Vallejo, California at Marin Street and Tennessee Street.  (DUF ¶ 1.)  The Computer-Aided Dispatch ("CAD") report, through the Mobile Dispatch Computer and over the radio, communicated to responding officers that the suspected shooter was "at large," was wearing a black hoodie and black pants, and had gotten into a black Lincoln four door vehicle which left the scene.  (DUF ¶¶ 2–5.)  Defendant Officers Cano and Aspegren were dispatched and en route to the scene by 4:46 p.m.  (DUF ¶ 6.)

Defendant Sergeant Postolaki arrived on the scene at 4:48 p.m.  (DUF ¶ 7.)  Defendant Postolaki immediately began to assess how best to provide emergency medical services to the victim of the shooting and secure the crime scene for investigation.  (DUF ¶ 8.)  Defendant Postolaki started in the alley where the victim was located and asked members of the public to

---

[1]  The relevant facts that follow are undisputed unless otherwise noted and are derived from the undisputed facts as stated by defendants and responded to by plaintiff (Doc. No. 163-1 ("DUF")), as well as the declarations and exhibits attached to the pending motion and the opposition thereto, and the video files (flash drive and CD) submitted to the court.  Plaintiff has not submitted his own statement of facts in support of his opposition, as permitted by Local Rule 260(b).  *See* L.R. 260(b) ("The opposing party may also file a concise 'Statement of Disputed Facts,' and the source thereof in the record, of all additional material facts as to which there is a genuine issue precluding summary judgment or adjudication.").  Instead, in his opposition plaintiff directs the court to "Please see Fourth Amended Complaint docket no. 127" for his statement of undisputed facts.  (Doc. No. 163 at 3.)  The court will not, however, refer to the allegations of plaintiff's operative complaint as evidence on summary judgment.  In addition, although plaintiff purports to dispute many of the facts listed by defendants as undisputed, he does so in several instances merely by repeating the fact in question and adding additional information to elaborate upon it.  (*See, e.g.*, DUF ¶¶ 14, 19.)  In other words, plaintiff does not actually dispute the fact or portions of the fact listed as undisputed by defendant, he merely provides additional information that he believes is relevant.  Thus, where plaintiff has not genuinely disputed a fact or a portion of that fact, the court has treated that fact as undisputed for the purposes of resolving the pending motion.  Further, plaintiff has provided the following or a similar string of objections to many of the undisputed facts as listed by defendants: "Dispute. Objection: Incomplete, inadmissible speculation, assumes facts not in evidence, improper legal conclusion, hearsay, relevance, incomplete hypothetical, improper expert testimony, contradicts prior sworn testimony, lacks authentication."  (*See, e.g.*, DUF ¶¶ 21, 22, 30, 51–53, 61–65, 67, 74, 76–78, 83–105.)  Plaintiff does not explain the basis for each such objection and the courts finds those objections inappropriate and unsupported.  They are therefore overruled.

leave the immediate area so paramedics could provide aid.  (DUF ¶ 9.)  While defendant Postolaki was clearing the alley, plaintiff approached him.  (DUF ¶ 10.)  Plaintiff told defendant Postolaki that the vehicle parked in the middle of Tennessee Street was the victim's father's car and was not associated with the shooter.  (DUF ¶ 11.)  Defendant Postolaki acknowledged the information and then asked plaintiff to wait and speak with the officers outside the immediate vicinity of the victim.  (DUF ¶ 12.)  There were at least a dozen members of the public at the scene, and defendant Postolaki briefly talked with a woman who was among those present and she offered him information about a vehicle.  (Doc. No. 160-5, Exhibit 5, Video 03:18–04:19.)  Defendant Postolaki then retrieved yellow caution tape and began to cordon off the crime scene.  (DUF ¶ 13.)

While unraveling the caution tape, defendant Postolaki noticed plaintiff again and asked him "Hey sir, did you see what happened?  I already talked to you, you were telling me about the car."  (Doc. No. 160-5, Exhibit 5, Video 05:38–05:43; DUF ¶ 15.)  Plaintiff responded by saying that he saw a person run "that way" but that nobody knows where the person went.  (DUF ¶ 16.)  Defendant Postolaki asked plaintiff to give him a description of the person running, and plaintiff responded, "I don't know what he look like" before directing defendant Postolaki to speak with "the girl in the white pants."  (Doc. No. 160-5, Exhibit 5, Video 05:50–05:58; DUF ¶ 18.)  Plaintiff began walking away, and defendant Postolaki then asked plaintiff for his name.  (*Id.* at 05:59–06:01; DUF ¶¶ 18–19.)  Plaintiff responded with what sounded to defendant Postolaki like "Brandon" and continued walking away towards the Okbah Grocery Shop.  (*Id.* at 06:01–06:03; DUF ¶¶ 21, 25.)  At approximately 4:54 p.m., defendant Officers Aspegren and Cano arrived at the scene.  (DUF ¶ 28.)  Defendant Postolaki then shouted to defendant Officers Cano and Aspegren, "Hey!  Get his ID right there," and pointed to plaintiff.  (Doc. No. 160-5, Exhibit 5, Video 06:03–06:08; DUF ¶¶ 26, 29.)  Defendant Postolaki then immediately turned around and resumed securing the crime scene with caution tape.  (*Id.* at 06:09; DUF ¶ 27.)

Defendant Officers Aspegren and Cano approached plaintiff and asked for his ID.  (DUF ¶ 31.)  Plaintiff asked the officers why they needed his ID.  (DUF ¶ 32.)  The officers did not provide plaintiff with a specific reason; defendant Cano stated "Because we asked for it.  Where's

3

1    your ID at?  Give me your ID now."  (DUF ¶ 33; Doc. No. 160-5, Exhibit 8, Video 00:22–00:30.)

2    Plaintiff indicated that he was going to the Okbah Grocery Store, and both officers then

3    simultaneously grabbed plaintiff's wrists.  (DUF ¶ 34; *Id.* at 00:31.)  Defendant Sergeant

4    Postolaki observed this disturbance and ran over.  (DUF ¶¶ 41, 42.)  According to defendant

5    Postolaki's body-worn camera, defendant Officer Cano had an arm wrapped around plaintiff's

6    neck, and he and defendant Officer Aspegren were in the process of taking plaintiff to the ground.

7    (Doc. No. 160-5, Exhibit 5, Video 06:30–06.35.)  Defendant Postolaki immediately gave orders

8    to the other officers, such as "Let's turn him over" and "Get him on his stomach."  (*Id.* at 06:33–

9    06:38.)

10        While plaintiff was lying on the ground on his side, defendant Postolaki grabbed his right

11   wrist and repeatedly told him to give him his arm.  (Doc. No. 160-5, Exhibit 7, Video 01:10–

12   01:30; DUF ¶ 44.)  Plaintiff said several times that his arm was broken, that he could not bend it,

13   and "ow."  (*Id.* at 01:06–01:25; Doc. No. 160-5, Exhibit 5, Video 06:34–7:11.)  Defendant

14   Officer Aspegren placed a hand and then a knee on plaintiff's face and neck, pushing him to the

15   ground.  (Doc. No. 160-5, Exhibit 5, Video 06:44–7:12.)  The officers handcuffed plaintiff's

16   hands behind his back and positioned him on his stomach.  (Doc. No. 160-5, Exhibit 7, Video

17   01:25–01:31.)

18        During this struggle, defendant Officer Nichols also arrived and saw defendants Postolaki,

19   Aspegren, and Cano on the ground with plaintiff and approached them.  (DUF ¶¶ 75, 76, 77.)

20   Defendant Nichols grabbed defendant Aspegren's radio, which had fallen, and held it for him

21   until plaintiff was placed in handcuffs.  (DUF ¶¶ 77, 78.)  Defendant Nichols never touched

22   plaintiff.  (DUF ¶ 74.)

23        Once he was handcuffed, defendants Aspegren and Cano lifted plaintiff to his feet.  (Doc.

24   No. 160-5, Exhibit 7, Video 01:53–01:57.)  They walked plaintiff over to their patrol vehicle,

25   patted him down, emptied his pants pockets, and placed him in their vehicle.  (*Id.* at 01:57–3:30.)

26   Defendants Aspegren and Cano then transported plaintiff to Sutter Hospital Solano to be cleared

27   for incarceration.  (DUF ¶ 80; Doc. No. 160-5 at 87–88.)  After being cleared by Sutter Hospital,

28   /////

1  plaintiff was booked into Solano County Jail for violation of California Penal Code § 148(a)(1).[2]

2  (DUF ¶ 82.)  Plaintiff was released from jail the next day.  (Doc. No. 164 at 93–95.)[3]

3          On August 20, 2018, Deputy District Attorney Susan Rados signed a Notification of Non-

4  Filing in which she indicated that a criminal case would not be filed against plaintiff despite the

5  § 148(a)(1) violation noted by officers upon booking.  (Doc. No. 164 at 265.)  In explanation, she

6  wrote:  "No particularized explanation provided as to why this particular person was to be

7  detained.  People do not have to cooperate or provide information to the police."  (*Id.*)

8  **B.      Procedural Background**

9          On July 26, 2019, plaintiff filed his complaint initiating this action.  (Doc. No. 1.)  On

10  August 31, 2023, the court issued an order granting in part and denying in part defendants'

11  motion to dismiss plaintiff's fourth amended complaint ("4AC"), stating that this action now only

12  proceeds as to the following five claims:  (1) plaintiff's first cause of action for an unlawful stop

13  in violation of the Fourth Amendment brought under 42 U.S.C. § 1983 against defendant

14  Postolaki; (2) plaintiff's third cause of action for excessive use of force in violation of the Fourth

15  Amendment brought under 42 U.S.C. § 1983 against defendants Aspegren, Cano, Postolaki, and

16  Nichols; (3) plaintiff's fourth cause of action for unlawful arrest in violation of the Fourth

17  Amendment brought under 42 U.S.C. § 1983 against defendants Aspegren, Cano, Postolaki, and

18  Nichols; (4) plaintiff's fifth cause of action for *Monell* liability brought under 42 U.S.C. § 1983

19  against defendants City of Vallejo and the City Council of the City of Vallejo; and (5) plaintiff's

20  /////

21

22  [2]  California Penal Code 148(a)(1) provides that "[e]very person who willfully resists, delays, or obstructs any public officer, peace officer, or an emergency medical technician . . . in the

23  discharge or attempt to discharge any duty of his or her office or employment, when no other punishment is prescribed, shall be punished by a fine not exceeding one thousand dollars

24  ($1,000), or by imprisonment in a county jail not to exceed one year, or by both that fine and imprisonment."

25

26  [3]  In opposition to defendants' pending motion for summary judgment, plaintiff's counsel states, without citation to any evidence before the court on summary judgment, that "Mr. Lake was in

27  jail for 23 days."  (Doc. No. 163 at 2.)  This unsupported assertion is directly contradicted by plaintiff's deposition testimony at which time he testified that he was released from jail the

28  morning after his arrest.  (Doc. No. 164 at 93–95.)

1    eighth cause of action for common law battery against defendants Aspegren, Cano, Postolaki,

2    Nichols, and City of Vallejo.  (Doc. No. 134 at 7.)

3         On October 15, 2024, defendants filed the pending motion seeking summary judgment in

4    their favor as to all of plaintiff's remaining claims.  (Doc. No. 160.)  On November 4, 2024,

5    plaintiff filed an opposition to that motion, and on November 12, 2024, defendants filed their

6    reply thereto.  (Doc. Nos. 163, 167.)

7         Below the court will first address the legal standards applicable to resolution of the

8    pending motion before turning to the arguments of the parties.

9                                    **LEGAL STANDARD**

10   **A.    Summary Judgment**

11        Summary judgment is appropriate when the moving party "shows that there is no genuine

12   dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

13   Civ. P. 56(a).

14        In summary judgment practice, the moving party "initially bears the burden of proving the

15   absence of a genuine issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387

16   (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The moving party

17   may accomplish this by "citing to particular parts of materials in the record, including

18   depositions, documents, electronically stored information, affidavits or declarations, stipulations

19   (including those made for purposes of the motion only), admissions, interrogatory answers, or

20   other materials," or by showing that such materials "do not establish the absence or presence of a

21   genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

22   Fed. R. Civ. P. 56(c)(1)(A), (B).  When the non-moving party bears the burden of proof at trial,

23   "the moving party need only prove that there is an absence of evidence to support the non-moving

24   party's case."  *Oracle Corp.*, 627 F.3d at 387 (citing *Celotex*, 477 U.S. at 325); *see also* Fed. R.

25   Civ. P. 56(c)(1)(B).  Indeed, after adequate time for discovery and upon motion, summary

26   judgment should be entered against a party who fails to make a showing sufficient to establish the

27   existence of an element essential to that party's case, and on which that party will bear the burden

28   of proof at trial.  *See Celotex*, 477 U.S. at 322.  "[A] complete failure of proof concerning an

1   essential element of the nonmoving party's case necessarily renders all other facts immaterial."

2   *Id.* at 322–23.  In such a circumstance, summary judgment should be granted, "so long as

3   whatever is before the district court demonstrates that the standard for the entry of summary

4   judgment . . . is satisfied."  *Id.* at 323.

5          If the moving party meets its initial responsibility, the burden then shifts to the opposing

6   party to establish that a genuine issue as to any material fact actually does exist.  *See Matsushita*

7   *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In attempting to establish the

8   existence of this factual dispute, the opposing party may not rely upon the allegations or denials

9   of its pleadings but is required to tender evidence of specific facts in the form of affidavits or

10  admissible discovery material in support of its contention that the dispute exists.  *See* Fed. R. Civ.

11  P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773

12  (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for

13  summary judgment.").  The opposing party must demonstrate that the fact in contention is

14  material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the

15  dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the

16  non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986).

17         In the endeavor to establish the existence of a factual dispute, the opposing party need not

18  establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

19  dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

20  trial."  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

21  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in

22  order to see whether there is a genuine need for trial.'"  *Matsushita*, 475 U.S. at 587 (citations

23  omitted).

24         "In evaluating the evidence to determine whether there is a genuine issue of fact," the

25  court draws "all inferences supported by the evidence in favor of the non-moving party."  *Walls v.*

26  *Cent. Contra Costa Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011).  It is the opposing party's

27  obligation to produce a factual predicate from which the inference may be drawn.  *See Richards*

28  *v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th

1    Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than

2    simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record

3    taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no

4    'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 586–87 (citations omitted).

5    **B.    Qualified Immunity**

6        Government officials are immune "from liability for civil damages insofar as their

7    conduct does not violate clearly established statutory or constitutional rights of which a

8    reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In

9    *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court set forth a two-part inquiry for

10   determining whether qualified immunity applies.  *See also District of Columbia v. Wesby*, 583

11   U.S. 48, 62–63 (2018); *Reichle v. Howards*, 566 U.S. 658, 664 (2012).  First, a court must ask,

12   "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the

13   officer's conduct violated a constitutional right?"  *Saucier*, 533 U.S. at 201.  If so, the court must

14   ask whether the constitutional right was "clearly established."  *Id.*  This second inquiry must be

15   undertaken in the specific context of the case.  *Id.*  The Supreme Court has removed any

16   requirement that the *Saucier* test be applied in a rigid order, holding "[t]he judges of the district

17   courts and the courts of appeals should be permitted to exercise their sound discretion in deciding

18   which of the two prongs of the qualified immunity analysis should be addressed first in light of

19   the circumstances in the particular case at hand."  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

20       For a right to be "clearly established," its "contours must be sufficiently clear that a

21   reasonable official would understand that" his or her actions violated that right.  *Hope v. Pelzer*,

22   536 U.S. 730, 739 (2002) (internal quotation marks omitted); *see also Ashcroft v. al-Kidd*, 563

23   U.S. 731, 741 (2011) ("A Government official's conduct violates clearly established law when, at

24   the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every

25   'reasonable official would [have understood] that what he is doing violates that right.'") (quoting

26   *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  "To meet this standard the very action in

27   question need not have previously been held unlawful."  *Tarabochia v. Adkins*, 766 F.3d 1115,

28   1125 (9th Cir. 2014) (internal citation and quotation marks omitted); *see also al-Kidd*, 563 U.S. at

741 ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."); *Jessop v. City of Fresno*, 936 F.3d 937, 940 (9th Cir. 2019). This is especially the case in the context of alleged Fourth Amendment violations, where the constitutional standard of "reasonableness" requires a fact-specific inquiry. *Mattos v. Agarano*, 661 F.3d 433, 442 (9th Cir. 2011) (en banc).

## ANALYSIS

### A.   Procedural Arguments

Plaintiff first contends that all of defendants' arguments in support of summary judgment in their favor must fail because defendants' counsel failed to meet and confer with plaintiff's counsel before filing their motion. (Doc. No. 163 at 3.) In reply, defendants argue that plaintiff's opposition should be disregarded as untimely because it was filed seven days late. (Doc. No. 167 at 3.) Defendants further note that plaintiff's opposition does not comply with Rule 56 or Local Rule 260(b) because it does not contain any citation to particular portions of evidence before the court on summary judgment. (*Id*.) Defendants concede that they did not meet and confer with plaintiff's counsel before filing the pending motion but explain that they did not do so because it would have been futile given the history of such efforts throughout this litigation.[4] (*Id*. at 2–3.) Counsel for defendants has also filed a declaration stating that the parties participated in a belated telephonic conference and were unable to narrow the issues in connection with the pending motion for summary judgment. (Doc. No. 168 at 2.)

The court readily acknowledges the various deficiencies each party has identified with respect to each other's submissions. Nonetheless, the court will decline to exercise its discretion to disregard any of the submissions on the grounds noted. The court will instead address the parties' substantive arguments, to the extent they can be evaluated based upon the briefing submitted.

/////

---

[4]  Defendants are perhaps referring to the many discovery disputes and the related extensive motion practice in this case, which has resulted in defendants moving for sanctions multiple times (Doc. Nos. 32, 88) and the previously assigned magistrate judge ultimately imposing monetary sanctions upon counsel for plaintiff. (Doc. Nos. 151, 153).

**B.    Substantive Arguments**

   1.    <u>Fourth Amendment Unlawful Stop and Arrest Claims</u>

   The Fourth Amendment to the Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court identified a three-tier structure in connection with Fourth Amendment jurisprudence.  "The first tier consists of those law enforcement activities, such as police questioning conducted pursuant to valid consent, that do not constitute searches or seizures governed by the Fourth Amendment."  *United States v. Erwin*, 803 F.2d 1505, 1508 (9th Cir. 1986) (summarizing *Terry*).  "The second tier consists of limited intrusions such as pat-downs of the outer clothing (or 'frisks') and brief investigative detentions."  *Id.*  "The third tier comprises 'full scale' searches or arrests requiring probable cause."  *Id.*

   As to the second tier, the Supreme Court held that, consistent with the Fourth Amendment, a brief, investigatory stop may be conducted when the officer has a reasonable, articulable suspicion that criminal activity is afoot.  *Terry*, 392 U.S. at 30; *see also Thomas v. Dillard*, 818 F.3d 864, 874 (9th Cir. 2016) ("To initiate a brief stop to investigate potential criminal activity, a stop that does not rise to the level of an arrest, an officer must have reasonable suspicion to believe 'criminal activity may be afoot.'").  This is "not a particularly high threshold to reach."  *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (en banc).  "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop."  *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).  Circumstances under which it may be objectively reasonable to conduct a minimally intrusive detention of a person who is not suspected of having committed a crime include "emergency situations" in which local law enforcement officers are acting to keep the peace.  *See Maxwell v. Cnty. of San Diego*, 708 F.3d 1075, 1084 (9th Cir. 2013); *see also Bernal v. Sacramento Cnty. Sheriff's Department*, 73 F.4th 678, 688 (9th Cir. 2023) ([P]recedents establish that, while detaining non-suspect witnesses can be permissible, the government's interest in such

1   detentions is greatly decreased for the simple yet significant reason that police do not have

2   individualized suspicion that the witness engaged in criminal activity.")

3       As to the third tier, "[w]here more than a limited intrusion occurs, an arrest occurs and

4   probable cause is required." *Kraus v. Pierce Cnty.*, 793 F.2d 1105, 1108–09 (9th Cir. 1986).

5   "When the line between a *Terry* stop and an arrest is crossed depends on all of the surrounding

6   circumstances, including the extent that freedom of movement is curtailed and the degree and

7   type of force or authority used to effectuate the stop." *Id.* "[I]t is well-established that intrusive

8   measures may convert a stop into an arrest if the measures would cause a reasonable person to

9   feel that he or she will not be free to leave after brief questioning—i.e., that indefinite custodial

10  detention is inevitable." *United States v. Guzman-Padilla*, 573 F.3d 865, 884 (9th Cir. 2009).

11      As noted in the court's previous orders resolving defendants' motions to dismiss in this

12  case, plaintiff's allegations as set forth in his numerous amended complaints have certainly not

13  been "a model of clarity." (Doc. No. 126 at 7.) However, the court understands plaintiff to have

14  alleged in his first cause of action that defendant Postolaki conducted an unlawful *Terry* stop

15  when he directed defendant Officers Aspegren and Cano to identify plaintiff. (Doc. No. 127 at

16  31.) The alleged detention of plaintiff for the purposes of identifying him lasted only a matter of

17  seconds before it allegedly escalated into an arrest when the officers used physical force against

18  plaintiff, handcuffed him, placed him in their vehicle, and transported him to jail. *See United*

19  *States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982) ("[H]andcuffing substantially aggravates

20  the intrusiveness of an otherwise routine investigatory detention and is not part of a typical *Terry*

21  stop."); *Hampton v. City of Oakland*, No. 13-cv-03094-DMR, 2014 WL 5600879, at *10 (N.D.

22  Cal. Nov. 3, 2014) (finding that a reasonable jury "could find that this incident ripened into an

23  arrest based on the intrusive tactics used by the officers on the scene, including the display of

24  firearms and handcuffing"). Therefore, the court will analyze the two aspects of plaintiff's

25  interaction with the defendant officers separately.

26          a.    *Unlawful Stop (Claim One)*

27      In moving for summary judgment, defendants argue that defendant Postolaki did not carry

28  out a *Terry* stop because he did not employ any physical force and instead merely gave an

11

1   instruction to other officers.  (Doc. No. 160-1 at 15.)  In the alternative, defendants argue that if

2   plaintiff was subjected to a *Terry* stop, then the stop was nonetheless reasonable.  (*Id*. at 15–18.)

3   In opposition, plaintiff argues that there was no reasonable suspicion to stop plaintiff because

4   plaintiff "looked nothing like," and was seven inches taller than, the suspected shooter identified

5   by the CAD report.  (Doc. No. 163 at 5–6.)

6          The court rejects defendants' argument that plaintiff cannot maintain this claim against

7   defendant Postolaki because he did not himself physically seize plaintiff.  "Section 1983 liability

8   extends to those who perform functions integral to an unlawful search, even if their individual

9   actions do not themselves rise to the level of a constitutional violation."  *Bravo v. City of Santa*

10  *Maria*, 665 F.3d 1076, 1089–90 (9th Cir. 2011).  It is true that "the integral participant doctrine

11  does not implicate government agents who are mere bystanders to an unconstitutional search."

12  *Id*. (internal quotation marks omitted).  Here, however, there is evidence before the court on

13  summary judgment suggesting that defendant Sergeant Postolaki was an integral participant, and

14  not a mere bystander, in plaintiff's detention, since he was the one who instructed other officers at

15  the scene to identify plaintiff.  *See Githinji v. Olympia Police Dep't*, No. 22-cv-05138-MJP, 2024

16  WL 689511, at *7 (W.D. Wash. Feb. 20, 2024) (finding sufficient evidence that one defendant

17  played an integral role in the plaintiff's detention where he "ordered [the plaintiff] to be

18  detained"); *id*. (noting that the plaintiff's unlawful seizure claim presents the issue of "whether an

19  officer who merely directs a detention or seizure can be liable under § 1983 for violating the

20  Fourth Amendment," and subsequently "allow[ing] the Fourth Amendment claim[] to proceed"

21  against such an officer).

22         As noted, defendants alternatively argue that detention of plaintiff "to determine his

23  connection to the premises and to ensure police safety" was supported by reasonable suspicion

24  due to plaintiff's "presence at [the] crime scene and behavior towards VPD officers while the

25  shooter was still at large."  (Doc. No. 160-1 at 15.)  Defendants also argue that even if the court

26  were to find that there was no reasonable suspicion to stop plaintiff, defendant Postolaki is

27  entitled to qualified immunity because "there is no case law that clearly establishes that detaining

28  a witness at a crime scene that officers have reason to believe is withholding relevant information

                                                    12

1   for the purpose of identifying the witness is a violation of that individuals [sic] Fourth

2   Amendment protected rights."  (*Id*. at 24–25.)

3         The undersigned has previously granted officers qualified immunity for the detention of a

4   witness at a "shots fired" scene carried out for the purposes of "identify[ing] those present,

5   secur[ing] the scene, preserv[ing] any evidence, and ensur[ing] public safety."  *Alston v. City of*

6   *Sacramento*, No. 2:21-cv-02049-DAD-AC (PS), 2023 WL 6626174, at *8 (E.D. Cal. Oct. 11,

7   2023), *report and recommendation adopted*, 2024 WL 733260 (E.D. Cal. Feb. 22, 2024).  In

8   *Alston*, the court observed that the Ninth Circuit has rejected an assertion of qualified immunity

9   where officers had separated and detained witnesses at the scene of a crime for five hours for the

10  sole purpose of gathering information from them, even though the crime had been solved.  *Id*. at

11  *7 (citing *Maxwell*, 708 F.3d at 1084).  In *Maxwell*, the Ninth Circuit noted that "there are few

12  cases discussing the reasonability of detaining witnesses solely for investigative purposes," and

13  that "[i]n most cases the lack of on-point precedent would compel us to grant qualified

14  immunity," but that the multi-hour detention at issue when "[t]he crime was solved" was

15  "obvious[ly]" unconstitutional.  *Id*. at 1083–84.  Considering this holding, the undersigned held in

16  *Alston* that a detention lasting ninety minutes, under circumstances where the shooter had not yet

17  been identified and there was an "obvious exigency of the situation," constituted a scenario "in

18  which the Ninth Circuit has indicated that the lack of on-point precedent compels a grant of

19  qualified immunity."  2023 WL 6626174, at *7–8.

20        Here, in contrast, the evidence before the court on summary judgment establishes that

21  plaintiff's alleged detention, from the time that defendant Postolaki ordered that he be identified

22  to the time that the other officers physically grabbed and arrested plaintiff, spanned less than

23  twenty seconds.  (Doc. No. 160-5, Exhibit 5, Video 06:06–06:26.)  In evaluating only the

24  detention of plaintiff before it escalated into an arrest, the court continues to agree with its

25  analysis in *Alston* that there is an absence of authority providing notice that detaining someone, as

26  defendant Postolaki ordered here, for approximately twenty seconds, at a busy crime scene in the

27  direct aftermath of a shooting, for the purposes of attempting to ascertain his identity and

28  /////

1    connection to the scene, constitutes a constitutional violation.  *See Alston*, 2023 WL 6626174, at

2    *8.

3        In addition, demonstrating that the constitutional right allegedly violated was clearly

4    established typically involves identifying "existing precedent" that "place[s] the statutory or

5    constitutional question beyond debate."  *Wesby*, 583 U.S. at 64; *see also id.* ("[S]pecificity is

6    especially important in the Fourth Amendment context . . . ."); *Sharp v. Cnty. of Orange*, 871

7    F.3d 901, 911 (9th Cir. 2017) ("Except in the rare case of an obvious instance of constitutional

8    misconduct . . . Plaintiffs must identify a case where an officer acting under similar circumstances

9    as [defendants] was held to have violated the Fourth Amendment.") (internal citation and

10   quotation marks omitted).  Here, plaintiff appears to argue that defendant Postolaki violated

11   plaintiff's clearly established constitutional right, but cites only "*Terry*," "*People Vs Flores*

12   *(2024)* [sic]," and "*Brown*" in support of this contention.  (Doc. No. 163 at 7.)  Counsel for

13   plaintiff provides no more complete citations and engages in no legal analysis describing the facts

14   of the cases for which she provides only partial citations, nor does counsel suggest any similarity

15   between them and the circumstances of plaintiff's brief detention.  Accordingly, in light of the

16   court's analysis and the lack of any meaningful opposition from plaintiff, defendants' motion for

17   summary judgment in their favor as to plaintiff's first claim for unlawful detention will be granted

18   on qualified immunity grounds.[5]

19                b.    *Unlawful Arrest (Claim Four)*

20        Next, the court turns to plaintiff's fourth claim for unlawful arrest brought against

21   defendants Aspegren, Cano, Postolaki, and Nichols.  Defendants argue that they are entitled to

22   summary judgment because there was probable cause to arrest plaintiff pursuant to California

23   Penal Code § 148(a)(1) for failure to provide his identification.  (Doc. No. 160-1 at 18–19.)

24   Defendants separately argue that defendant Nichols is entitled to summary judgment because he

25   was not "an integral participant in the alleged wrongdoing" and "did not participate in any

26   meaningful way with Plaintiff being taken into custody."  (*Id.* at 19.)  Further, defendants argue

27

28   _____

[5]  Having come to this conclusion, the court need not, and does not, specifically address
defendants' argument that the detention of plaintiff was reasonable as a matter of law.

1  that they are entitled to qualified immunity as to this claim because "even if [p]laintiff's failure to

2  identify himself did not provide probable cause to arrest," this was not clearly established at the

3  time of the events in this case.  (*Id.* at 25.)  In opposition, plaintiff argues that his arrest was not

4  supported by probable cause and that qualified immunity should not apply.  (Doc. No. 163 at 7–

5  9.)[6]

6          The court agrees that defendant Nichols is entitled to summary judgment in his favor.  The

7  undisputed evidence before the court on summary judgment establishes that defendant Nichols

8  arrived at the scene after plaintiff was already on the ground with the other defendant officers

9  standing or kneeling over him.  (Doc. No. 160-5, Exhibit 10, Video 00:36–00:46.)  The evidence

10 also shows that defendant Nichols merely held defendant Aspegren's radio for approximately

11 fifteen seconds while plaintiff was handcuffed, and that defendant Nichols then walked off to

12 engage in other tasks including talking with other witnesses at the scene.  (*Id.* at 00:46–01:04.)

13 The evidence on summary judgment is undisputed that defendant Nichols was not present for any

14 of the events precipitating plaintiff's arrest, was not physically involved in the act of arresting

15 plaintiff, and was not involved in taking plaintiff to a police vehicle for transport to jail.

16 /////

---

17 [6] In response to defendant Nichols' separate argument that he was not involved with plaintiff's

18 arrest in any meaningful way, plaintiff now seeks leave to amend his 4AC.  (Doc. No. 163 at 9.)
   Counsel for plaintiff states in their opposition that "it appears [she] confused" defendant Nichols

19 with officer Rouse and that she "just found out the error while working on this opposition."  (*Id.*)
   In reply, defendants argue that plaintiff's request for leave to amend must be denied because

20 officer Rouse was terminated from this action on December 14, 2022 following the court's oral
   ruling on defendants' motion to dismiss plaintiff's second amended complaint.  (Doc. No. 167 at

21 9) (citing Doc. No. 112.)  Defendants argue that allowing amendment at this late stage of the
   litigation would be both futile and prejudicial as it would unnecessarily prolong these

22 proceedings.  (Doc. No. 167 at 9.)  The court agrees.  While leave to amend pleadings "shall be

23 freely given when justice so requires," Fed. R. Civ. P. 15(a), it need not be granted when the
   amendment:  (1) prejudices the opposing party; (2) is sought in bad faith; (3) produces an undue

24 delay in litigation; or (4) is futile.  *See AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d
   946, 951 (9th Cir. 2006) (citing *Bowles v. Reade*, 198 F.3d 752, 757 (9th Cir. 1999)).  In

25 considering these factors, the granting of further leave to amend is not warranted here.  Plaintiff's
   counsel has provided no explanation for the lengthy delay in discovering her purported error and

26 has presented no plausible theory of liability plaintiff could pursue against officer Rouse were

27 further amendment permitted.  The court concludes that granting leave to amend to assert new
   claims against a previously terminated defendant at this late stage of the proceedings, after

28 discovery and law and motion have closed, would be both prejudicial to the defense and futile.

1    As discussed above, the "integral participant" doctrine "extends liability to those actors

2    who were integral participants in the constitutional violation, even if they did not directly engage

3    in the unconstitutional conduct themselves." *Hopkins v. Bonvicino,* 573 F.3d 752, 770 (9th Cir.

4    2009).  The doctrine requires "some fundamental involvement in the conduct that allegedly

5    caused the violation." *Blankenhorn v. City of Orange,* 485 F.3d 463, 481 n.12 (9th Cir. 2007).

6    "A defendant's 'mere presence' on the scene where a violation occurs or membership in the

7    'group' or 'team' that collectively caused the violation is insufficient to find 'fundamental

8    involvement.'" *Johnson v. Bay Area Rapid Transit Dist.*, No. 09-cv-00901-EMC, 2013 WL

9    6155266, at *6 (N.D. Cal. Nov. 22, 2013) (citing *Jones v. Williams*, 297 F.3d 930, 939 (9th Cir.

10   2002)).  Based on the evidence before the court on summary judgment, which demonstrates

11   defendant Nichols' extremely limited involvement even in the events surrounding plaintiff's

12   arrest and total lack of involvement in the use of force on him, the court concludes that defendant

13   Nichols was not an integral participant in plaintiff's arrest and is entitled to summary judgment in

14   his favor as to this claim.  *See Blankenhorn*, 485 F.3d at 481 n.12 (finding that the district court

15   properly granted summary judgment in favor of two defendant officers, one who arrived on the

16   scene after the arrest at issue was completed, and one who "at most provided crowd control");

17   *Hickman v. City of Berkeley*, No. 11-cv-04395-EDL, 2012 WL 12910620, at *8 (N.D. Cal. Nov.

18   1, 2012) (granting partial summary judgment on the plaintiff's unlawful stop and unlawful arrest

19   claims in favor of two defendant officers who were present but had "minimal" involvement in the

20   plaintiff's arrest).[7]

21   /////

22

23   ─────────────────────

     [7]  For the same reasons, the court will also grant summary judgment in defendant Nichols' favor

24   as to plaintiff's claims for excessive force and battery brought against him, because the body-
     worn camera footage presented on summary judgment clearly establishes that plaintiff was

25   already on the ground when defendant Nichols arrived at the scene and that defendant Nichols
     never touched plaintiff.  *See Adams v. City of Hayward*, No. 14-cv-05482-KAW, 2016 WL

26   7157759, at *5 (N.D. Cal. Dec. 8, 2016) (granting summary judgment in defendant Colton's favor
     on the plaintiff's excessive force claim where there was "no genuine dispute that Officer Colton

27   did not use force against [the p]laintiff," noting that "Officer Colton had no involvement in the
     take-down itself, but arrived after Officer Mills had already pulled [the p]laintiff onto the floor"

28   and therefore he "was not an integral participant in the take-down").

As to defendants Aspegren, Cano, and Postolaki, the court next considers whether there was probable cause to arrest plaintiff under California Penal Code § 148(a)(1) for failure to disclose his identity. "In the context of a § 1983 action, a Fourth Amendment violation occurs when a person is arrested 'without probable cause or other justification.'" *Vanegas v. City of Pasadena*, 46 F.4th 1159, 1164 (9th Cir. 2022) (quoting *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 918 (9th Cir. 2012)). "Probable cause to arrest exists when there is a 'fair probability or substantial chance of criminal activity' by the arrestee based on the totality of the circumstances known to the officers at the time of arrest." *Id.* "The elements of a Section 148 violation under California law require a showing that (1) the defendant willfully resisted, delayed, or obstructed a peace officer, (2) when the officer was engaged in the [lawful] performance of his or her duties, and (3) the defendant knew or reasonably should have known that the other person was a peace officer engaged in the performance of his or her duties." *Noble-Perez v. Robinson*, No. 8:22-cv-00037-JVS (JDEx), 2023 WL 6194265, at *8 (C.D. Cal. Aug. 16, 2023) (citing *Smith v. City of Hemet*, 394 F.3d 689, 695 (9th Cir. 2005)).

Defendants contend that there was probable cause to arrest plaintiff because the officers "had a right to identify witnesses to the shooting" and "[f]ailure to disclose identity at the request of an officer unquestionably serves to resist, delay, and obstruct the responsible peace officers." (Doc. No. 160-1 at 19.) The court finds defendants' argument in this regard to be unpersuasive. As the district court in *Noble-Perez* observed:

> Additionally, refusing to produce identification does not give rise to probable cause to arrest under Section 148 because there is no requirement under California law that a person being detained provide an identifying document. While there are some statutes that require people to produce identification to law enforcement officers, they do not pertain to the facts now before the Court. *See, e.g.*, Cal. Veh. Code § 12951(b) ("The driver of a motor vehicle shall present his or her license for examination upon demand of a peace officer enforcing the provisions of this code."); Cal. Veh. Code § 22511.56 ("[a] person using a distinguishing placard . . . shall, upon request of a peace officer or person authorized to enforce parking laws . . . present identification and evidence of the issuance of that placard or plate to that person."). Section 148 contains no similar presentment requirement. The Court therefore declines to read a provision into Section 148 that is simply not present.

*Noble-Perez*, 2023 WL 6194265, at *8.

1    Defendants also argue that the decisions in *Hiibel v. Sixth Judicial District Court of*

2  *Nevada, Humboldt County*, 542 U.S. 177 (2004) and *United States v. Landeros*, 913 F.3d 862

3  (9th Cir. 2019) support their position that plaintiff's arrest was supported by probable cause.

4  (Doc. No. 160-1 at 18–19.)  However, the Supreme Court in *Hiibel* was addressing an entirely

5  different question—namely, whether a Nevada statute stating that "any person so detained shall

6  identify himself . . ." runs afoul of the Fourth Amendment.  "[T]here is no California analogue" to

7  the Nevada statute requiring a person to identify himself.  *Noble-Perez*, 2023 WL 6194265, at *9

8  ("The California statute imposes no such requirement and the Court therefore declines to read

9  such a provision into Section 148 that the legislature did not envision.").  Indeed, the Supreme

10  Court specifically acknowledged in *Hiibel* that in states that do not have "stop and identify"

11  statutes, such as in California, "a suspect may decline to identify himself without penalty."

12  *Hiibel*, 542 U.S. at 183.  Moreover, the Nevada Supreme Court has interpreted that state's statute

13  which was at issue in *Hiibel* "to require only that a suspect disclose his name," and not provide an

14  identifying document.  *Hiibel*, 542 U.S. at 185.  Here, the evidence on summary judgment

15  establishes that defendant Officer Cano stated "Where's your ID at?  Give me your ID now" and

16  thus, even were the decision in *Hiibel* to govern the inquiry under California Penal Code § 148,

17  his demands of plaintiff exceeded the scope under that decision.  *Noble-Perez*, 2023 WL

18  6194265, at *9 ("Robinson's repeated demands that Noble-Perez produce his 'I.D.' and order to

19  'give me your I.D., or I'm going to put you in cuffs' falls outside of *Hiibel*'s scope.").  In short,

20  the decision in *Hiibel* does not support defendants' argument in any respect.

21    Defendants also cite the Ninth Circuit's decision in *Landeros* for the proposition that "[i]n

22  some circumstances, a suspect may be required to respond to an officer's request to identify

23  herself, and may be arrested if she does not."  (Doc. No. 160-1 at 18) (citing *Landeros*, 913 F.3d

24  at 869).  In making this observation, however, the court was specifically addressing *Hiibel* and

25  Nevada's "stop and identify" statute.  *Landeros* does not stand for the proposition that in the

26  absence of a "stop and identify" statute, a person must provide their identification to the police

27  when ordered to.  Instead the Ninth Circuit held just the opposite in *Landeros*:

28  /////

1
2          In short, *Brown* holds that an officer may not lawfully order a person
           to identify herself absent particularized suspicion that she has
           engaged, is engaging, or is about to engage in criminal activity, and
3          *Hiibel* does not hold to the contrary.

4          As explained above, the officers insisted several times that Landeros
           identify himself after he initially refused, and detained him while
5          making those demands.  At the time they did so, the officers had no
           reasonable suspicion that Landeros had committed an offense.
6          Accordingly, the police could not lawfully order him to identify
           himself.  His repeated refusal to do so thus did not, as the government
7          claims, constitute a failure to comply with an officer's lawful order,
           Ariz. Rev. Stat. Ann. § 28-622(A).    There was therefore no
8          justification for the extension of the detention to allow the officers to
           press Landeros further for his identity.

9     913 F.3d at 870.

10          Even if plaintiff were required by California law to provide his identification, which he is

11    not, the evidence on summary judgment establishes that the interaction between plaintiff and

12    officers Aspegren and Cano lasted only approximately ten seconds before the officers grabbed

13    plaintiff's arms.  (Doc. No. 160-5, Exhibit 8, Video 00:21–00:31.)  "A person's failure to respond

14    with alacrity to police orders" is clearly not criminalized under Section 148.  *People v. Quiroga*,

15    16 Cal. App. 4th 961, 966 (1993); *see also Ruiz v. Polar*, No. 24-1215, 2025 WL 733238, at *1

16    (9th Cir. Mar. 7, 2025)[8] (holding that a delay of twenty seconds in complying with an officer's

17    orders did not constitute probable cause to arrest the plaintiff for violating California Penal Code

18    § 148(a)(1)).  Ten seconds is certainly not a meaningful length of time sufficient to amount to

19    delay or obstruction of a peace officer's attempt to discharge their duties.  The evidence on

20    summary judgment is therefore insufficient to establish probable cause to arrest under California

21    Penal Code 148(a)(1).

22          The court concludes that defendants have not demonstrated on summary judgment that

23    there was probable cause to arrest plaintiff for a violation of California Penal Code § 148(a)(1)

24    due to his failure to provide identification.  The court therefore turns to defendants' argument that

25    even if plaintiff's failure to identify himself did not provide probable cause to arrest, they are

26    /////

27
28    [8]  Citation to unpublished Ninth Circuit opinions throughout this opinion is appropriate pursuant
      to Ninth Circuit Rule 36-3(b).

                                                19

1  entitled to qualified immunity as to this claim because the law in this regard was not clearly

2  established.

3      Defendants argue that the Ninth Circuit's decision in *Vanegas*, 46 F.4th 1159, where the

4  court granted summary judgment in favor of officers who made an arrest under California Penal

5  Code § 415 (a disturbing-the-peace ordinance) and § 148(a)(1), demonstrates that "no California

6  case clearly establishes that an officer should have known he lacked probable cause to arrest

7  under Penal Code § 148 an individual when they fail to identify himself [sic]."  (Doc. No. 160-1

8  at 25) (citing *Vanegas*, 46 F.4th at 1166).  The argument in reliance on the decision in *Vanegas* is

9  not persuasive.  Not only was plaintiff Vanegas the suspect of an investigation, but his

10  identification was directly related to the officer's ability to carry out his duties.  The officer in that

11  case was investigating a stalking complaint knowing that the suspect was named "Javier

12  Vanegas" and, upon locating the only man in the area where the alleged stalking occurred, the

13  officer stopped the plaintiff, inquired whether his name was "Javier," and asked for his

14  identification.  *Id*. at 1163.[9]  Thus the facts of the case confronted by the Ninth Circuit in

15  *Vanegas*, where the officers were well aware of the name of the suspect they sought, are clearly

16  distinguishable from the facts established by the evidence on summary judgment in this case.

17      In this case the officers were not seeking a suspect by a particular name, and instead the

18  CAD report merely informed them of a physical description of the suspected shooter who had

19  fled the scene.  Moreover, plaintiff did not even match this physical description of the suspected

20  shooter and was simply one of several people at the scene in the aftermath of the shooting.  In

21  light of these facts, the court concludes that identifying plaintiff Lake by name was simply not

22  directly related to the officers' investigation as to the perpetrator of the shooting.  *See Noble-*

23  *Perez*, 2023 WL 6194265, at *9 ("In *Vanegas*, learning the plaintiff's name was directly related

24  to the officer's investigation of an alleged stalking where the officer knew the suspect's

25  _____

26  [9]  Given these circumstances, the Ninth Circuit declined to address whether or not "Vanegas's failure to identify himself [] provided probable cause to arrest under § 148(a)(1)," and instead

27  decided that "no California case clearly establishes that Officer Klotz should have known he lacked probable cause to arrest Vanegas for failing to identify himself in the course of the stalking

28  investigation."  *Vanegas*, 46 F.4th at 1166–67.

1    name. . . .  Learning Noble-Perez's name or obtaining identification verifying his identity are not

2    necessary, or arguably even relevant, to achieving the officers' objective in clearing out the

3    embankment.  If the officers were looking for a specific trespasser who had previously been

4    reported, [], or whose name they were aware of, [], then the analysis would be different.")

5    (citations omitted).  Therefore, plaintiff's unwillingness to show identification to the officers did

6    not serve to "delay or obstruct a peace officer in the discharge of any duty within the meaning of

7    the statute."  *In re Chase C*., 243 Cal. App. 4th 107, 116 (2015).

8            Defendants cite no other case law in support of their qualified immunity argument.

9    Nonetheless, the court has reviewed other cases in which courts have found that probable cause

10    existed to arrest individuals for violation of § 148(a)(1) who had failed to identify themselves.

11    Each of those cases identified by the court are also factually distinguishable from this case in that

12    each plaintiff was suspected or accused of some other unlawful conduct and learning the person's

13    name served to directly further the officer's investigation.  *See Kuhlken v. Cnty. of San Diego*,

14    764 F. App'x 612, 613 (9th Cir. 2019) (affirming the district court's finding that the defendant

15    deputy "had probable cause to arrest [the plaintiff] for a violation of California Penal Code

16    § 148(a)(1)" where the plaintiff was accused of assault with a deadly weapon and was obligated

17    to provide identification under California Vehicle Code § 12951(b)); *Nakamura v. City of*

18    *Hermosa Beach*, No. 06-cv-06776-GW-SS, 2009 WL 1445400, at *8 (C.D. Cal. May 20, 2009)

19    (finding that where the defendant officer had probable cause to arrest the plaintiff for stalking

20    after the victim identified him, and the plaintiff tried to run away from the officer and refused to

21    provide his name or identification, the officer also had probable cause to arrest under

22    § 148(a)(1)), *aff'd*, 372 F. App'x 787 (9th Cir. 2010); *Abdel-Shafy v. City of San Jose*, No. 17-cv-

23    07323-LHK, 2019 WL 570759, at *8 (N.D. Cal. Feb. 12, 2019) (finding that "the [o]fficers'

24    arrest of [the p]laintiff did not violate [the p]laintiff's Fourth Amendment rights" where the

25    plaintiff refused to identify herself after she had been identified as the one who had initiated and

26    actively participated in an altercation and the officers "were investigating [that] altercation in

27    which [she] was involved"); *see also People v. Knoedler*, 44 Cal. App. 5th Supp. 1, 2–4 (2019)

28    (noting that "failure to identify oneself cannot, on its own, justify an arrest" but finding that

21

1  "when a person refuses to identify himself to an officer who is writing a citation to that person for

2  an infraction offense, that refusal can be the basis for a finding that the person resisted,

3  obstructed, or delayed an officer in violation of Penal Code section 148, subdivision (a)(1)").

4        Here, plaintiff was merely an individual present at the scene after the commission of a

5  crime, but there was no reason to even suspect that he had committed that or any other crime.  At

6  the time of this incident it was clearly established law that, under such circumstances, probable

7  cause to arrest plaintiff for failing to produce identification was lacking.  California Penal Code

8  § 148(a)(1) imposes no affirmative requirement that a person provide their name or give proper

9  identification.  *See Noble-Perez*, 2023 WL 6194265, at *9 ("[T]here is a clear absence of a

10  requirement to identify oneself in Section 148, unlike the statute in *Hiibel*.")  Further, both before

11  and after the events in question, California and federal courts have held that in a context such as

12  this one, where the plaintiff is not suspected of any crime and has not participated in other acts of

13  obstruction or defiance, "failing to identify oneself alone does constitute a violation of Section

14  148."  *Id.*; *see also Martinelli v. City of Beaumont*, 820 F.2d 1491, 1494 (9th Cir. 1987) ("The

15  court should have instructed the jury that the use of Section 148 to arrest a person for refusing to

16  identify herself during a lawful *Terry* stop violates the Fourth Amendment's proscription against

17  unreasonable searches and seizures."); *United States v. Christian*, 356 F.3d 1103, 1106 (9th Cir.

18  2004) ("[F]ailure to identify oneself cannot, on its own, justify an arrest."); *In re Chase C.*, 243

19  Cal. App. 4th at 118–20 (finding that, where the plaintiff was not the "initial target of the

20  investigation, but was merely . . . present when officers began investigation," his refusal to

21  identify himself before being placed in a patrol car was protected conduct and a lawful exercise of

22  his rights that "cannot violate section 148"); *Belay v. City of Gardena*, No. 2:15-cv-08063-CAS-

23  JC, 2017 WL 1628398, at *4–5 (C.D. Cal. Apr. 27, 2017) ("However, it is clearly established law

24  in [the] Ninth Circuit that failure to identify oneself cannot, on its own, justify an arrest.  . . .

25  [T]he contours of the Fourth Amendment right were sufficiently clear that every reasonable

26  official would have understood that arresting plaintiff [under Penal Code section 148(a)(1)] for

27  his refusal to identify himself violated plaintiff's right to be free from unreasonable seizure.")

28  (citations omitted); *see also Maldonado v. Boudreaux*, No. 1:22-cv-01518-HBK (PC), 2024 WL

1    4906039 (E.D. Cal. Nov. 27, 2024) (finding that under the circumstances in that case the

2    defendant deputies had probable cause to arrest the plaintiff, but noting that "refusal to provide

3    identifying information to law enforcement officers is insufficient by itself to provide probable

4    cause for arrest under § 148(a)(1)").

5        The court finds that the law, "undertaken in light of the specific context" of this case, was

6    not unclear. *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (citation omitted).  Accordingly, the court

7    will deny defendants' motion for summary judgment in favor of defendants Aspegren, Cano, and

8    Postolaki as to plaintiff's unlawful arrest claim on qualified immunity grounds.

9            2.    Fourth Amendment Excessive Force Claim (Claim Three)

10        Defendants next move for summary judgment in their favor as to plaintiff's excessive

11    force claim brought against defendants Aspegren, Cano, and Postolaki.[10]  (Doc. No. 160-1 at 19.)

12    Defendants argue that the officers used the least amount of force necessary, particularly in light of

13    "plaintiff's uncooperative behavior" and "his knowledge of the circumstances surrounding a

14    serious crime and his failure to positively identify himself."  (*Id*. at 22.)  Plaintiff does not clearly

15    address defendants' arguments in this regard, but rather vaguely states throughout his opposition

16    brief that he was "beat" by the officers.  (Doc. No. 163 at 2, 7–9.)

17        A claim that a law enforcement officer used excessive force during the course of an arrest

18    is analyzed under the Fourth Amendment's objective reasonableness standard.  *Graham v.

19    Connor*, 490 U.S. 386, 395 (1989); *Tennessee v. Garner*, 471 U.S. 1, 7–8 (1985).  Under this

20    standard, "'[t]he force which [i]s applied must be balanced against the need for that force:  it is

21    the need for force which is at the heart of the *Graham* factors.'"  *Liston v. Cnty. of Riverside*, 120

22    F.3d 965, 976 (9th Cir. 1997) (quoting *Alexander v. City and Cnty. of San Francisco*, 29 F.3d

23    1355, 1367 (9th Cir. 1994)).  In *Graham*, the Supreme Court indicated that relevant factors in the

24    Fourth Amendment reasonableness inquiry include "[1] the severity of the crime at issue,

25    [2] whether the suspect poses an immediate threat to the safety of the officers or others, and

26    [3] whether he is actively resisting arrest or attempting to evade arrest by flight."  490 U.S. at

27

28    _____

[10]  Above, the court has already addressed the separate argument advanced by defendants as to
defendant Nichols and found the granting of summary judgment in his favor to be appropriate.

23

1    396.  Thus, in light of the facts and circumstances surrounding a law enforcement officer's

2    actions, courts "must balance the nature of the harm and quality of the intrusion on the

3    individual's Fourth Amendment interests against the countervailing governmental interests at

4    stake." *Bryan v. MacPherson*, 630 F.3d 805, 823 (9th Cir. 2010) (citations and internal

5    quotations omitted); *see also Scott v. Harris*, 550 U.S. 372, 383–84 (2007); *Santos v. Gates*, 287

6    F.3d 846, 853 (9th Cir. 2002), *overruled on other grounds by Pearson*, 555 U.S. 223; *Deorle v.*

7    *Rutherford,* 272 F.3d 1272, 1280 (9th Cir. 2001); *Liston*, 120 F.3d at 976.  "Force is excessive

8    when it is greater than is reasonable under the circumstances." *Santos*, 287 F.3d at 854 (citing

9    *Graham*, 490 U.S. 386).  Accordingly,

10   
11   
12   
13

> [a]lthough it is undoubtedly true that police officers are often forced to make split-second judgments, and that therefore not every push or shove, even if it may seem unnecessary in the peace of a judge's chambers is a violation of the Fourth Amendment, it is equally true that even where some force is justified, the amount actually used may be excessive.

14   *Id.* at 853 (citations and internal quotations omitted).

15        The Ninth Circuit has recognized that "the excess force and false arrest factual inquiries

16   are distinct." *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1024 (9th Cir. 2015) (quoting

17   *Beier v. City of Lewiston*, 354 F.3d 1058, 1064 (9th Cir. 2004)).  "In other words, an officer may

18   use force to make an arrest regardless of whether the officer had probable cause to make the

19   arrest." *Smith v. Cnty. of Orange*, 678 F. Supp. 3d 1182, 1206 (C.D. Cal. 2023) (citations

20   omitted), *appeal dismissed sub nom. Smith v. Packham*, No. 23-55641, 2023 WL 9291578 (9th

21   Cir. Dec. 6, 2023).  Thus, "establishing a lack of probable cause to make an arrest does not

22   establish an excessive force claim, and vice-versa." *Velazquez*, 793 F.3d at 1024 (quoting *Beier*,

23   354 F.3d at 1064).

24        In resolving the pending motion, it is important to keep in mind the following admonition

25   of the Ninth Circuit with respect to the use of summary judgment in cases involving claims of

26   excessive use of force:

27   
28

> Under the Fourth Amendment, law enforcement may use "objectively reasonable" force to carry out such seizures; as in the unlawful arrest analysis, this objective reasonableness is determined

24

by an assessment of the totality of the circumstances. *Graham v. Connor*, 490 U.S. 386, 397 (1989). Because this inquiry is inherently fact specific, the "determination whether the force used to effect an arrest was reasonable under the Fourth Amendment should only be taken from the jury in rare cases." *Headwaters Forest Def. v. Cty. of Humboldt*, 240 F.3d 1185, 1205–06 (9th Cir. 2000), *cert. granted, judgment vacated on other grounds*, 534 U.S. 801 (2001); *see also Torres [v. City of Madera]*, 648 F.3d [1119,] 1125 [(9th Cir. 2011)] (summary judgment "in excessive force cases should be granted sparingly"); *Liston v. County of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997) (finding that excessive force is "ordinarily a question of fact for the jury"); *Chew v. Gates*, 27 F.3d 1432, 1443 (9th Cir. 1994) ("[W]hether a particular use of force was reasonable is rarely determinable as a matter of law.").

*Green v. City and Cnty. of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014).

Although plaintiff has not clearly responded to defendants' arguments as to this claim, the court nonetheless finds that there are disputed issues that preclude its resolution on summary judgment because consideration of the *Graham* factors based upon the evidence before the court on summary judgment do not conclusively weigh in favor of the defendant officers.

### a.  *Nature and Quality of the Intrusion*

Although neither party has addressed this factor in their briefing, the court must begin "by assessing the nature and quality of the intrusion." *Bernal*, 73 F.4th at 693. First, a reasonable jury could conclude based on plaintiff's physical size alone, described in the arrest and detention form as being six feet and five inches tall (Doc. No. 164 at 260), that it took a substantial amount of force for the officers to bring him to the ground. *See A.B. v. Cnty. of San Diego*, No. 18-cv-01541-MMA-LL, 2020 WL 5847551, at *10 (S.D. Cal. Oct. 1, 2020) ("A reasonable jury could conclude that it takes a substantial amount of force to push a "well-developed and well-nourished" 34-year old, 165-pound male onto the ground."), *aff'd*, No. 20-56140, 2022 WL 1055558 (9th Cir. Apr. 8, 2022). Next, after the physical interaction with the defendant officers, plaintiff was taken to Sutter Hospital Solano. (DUF ¶ 80; Doc. No. 160-5 at 87–88.) From this evidence, a jury could reasonably infer that the force employed was significant and plaintiff's injuries were substantial enough to warrant medical attention. *See Noble-Perez*, 2023 WL 6194265, at *15. Further, according to plaintiff's deposition testimony, he suffered headaches for several months after the incident, still suffers arm pain, had visible bruising for weeks on his

1   shoulder and neck, and suffered abrasions on his face.  (Doc. No. 164 at 47–56.)  Thus, the court

2   concludes based upon this evidence that a jury could find the nature and quality of the intrusion

3   here was moderate—perhaps not severe but not insubstantial.  *Cf. Noble-Perez*, 2023 WL

4   6194265, at *15 (finding the nature and quality of the intrusion to be small where the plaintiff

5   was "thrown to the ground" but did not suffer any "fractures or distress"); *Drummond ex rel.*

6   *Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003) (finding the use of force to

7   be "severe" where "two officers continued to press their weight on [the plaintiff's] neck and

8   torso").

9                        b.      *Severity of the Crime at Issue*

10          Defendants urge the court to consider the seriousness of the shooting to which the

11  defendant officers were dispatched, which was "either a murder or attempted murder" and was a

12  "serious violent felony."  (Doc. No. 160-1 at 21.)  However, the shooting is not a crime that

13  plaintiff was suspected of; the defendant officers assert only that they had probable cause to arrest

14  plaintiff for failing to identify himself.  "When analyzing this factor, [courts] typically look to the

15  alleged crime of the person being detained."  *Bernal*, 73 F.4th at 692.  "However, when police are

16  responding to an ongoing emergency, [courts] consider the 'serious—indeed, life-threatening—

17  situation . . . unfolding at the time.'"  *Id.* (quoting *Ames v. King Cnty.*, 846 F.3d 340, 349 (9th Cir.

18  2017)).

19          Disregarding an officer's commands, to the extent they are lawful commands, is "a minor

20  infraction that justifies, at most, only a minimal use of force," which would tend to tip

21  consideration of this factor in favor of plaintiff.  *Nelson v. City of Davis*, 685 F.3d 867, 880 (9th

22  Cir. 2012).  However, given the more time-sensitive context here involving the aftermath of a

23  shooting with an injured victim and a suspect who had fled the scene, the severity increases, and

24  the court will therefore weigh this factor neutrally.  *Cf. Bernal*, 73 F.4th at 692 (finding that this

25  factor weighed "slightly in favor of the Deputies" where "at most, [the plaintiff] resisted the

26  Deputies' orders" but the context involved an "actively unfolding emergency of a threatened

27  school shooting").

28  /////

1      c.  *Threat to the Officers' Safety*

2    Defendants argue that plaintiff presented a moderate level of threat because of his size and

3 because he was "reaching for his waistband." (Doc. No. 160-1 at 21–22.) Based on the body-

4 worn camera footage submitted to the court on summary judgment, defendant Cano appears to be

5 quite similar in height and stature to plaintiff. (Doc. No. 160-5, Exhibit 7, Video 02:30.) Further,

6 the only evidence before the court regarding plaintiff's waistband is found in defendant

7 Aspegren's police report, in which he states that after plaintiff and the officers were already on

8 the ground, "an Officer announce[d] that [plaintiff] was reaching under his body" and "that

9 subjects commonly keep weapons in the waistbands and front pants pockets." (Doc. No. 160-1 at

10 88.) The court therefore finds that there has been little or no evidence presented supporting

11 defendants' assertion that before any force was used against plaintiff, he presented a moderate

12 level of threat to the officers. *See Lopez v. City of Imperial*, No. 13-cv-00597-BAS-WVG, 2015

13 WL 4077635, at *10–11 (S.D. Cal. July 2, 2015) (finding "nothing to suggest [the plaintiff] posed

14 an immediate threat to the officers," noting that "[f]rom the Dashcam, [the plaintiff] does not

15 appear to be significantly larger than the two officers"); *see also Deorle*, 272 F.3d at 1281 ("[A]

16 simple statement by an officer that he fears for his safety or the safety of others is not enough;

17 there must be objective factors to justify such a concern.").

18      d.  *Resisting Arrest*

19    Defendants argue that under the third *Graham* factor, the court should consider plaintiff's

20 resistance and find that "the active resistance by plaintiff weighs in favor of [the officers']

21 conduct being reasonable." (Doc. No. 160-1 at 22.)

22    The evidence submitted to the court on summary judgment does not make clear whether

23 or how plaintiff physically resisted arrest. The court has reviewed the officers' body-worn

24 camera footage and notes that as soon as officers Cano and Aspegren reached for plaintiff's arms,

25 events transpired rapidly and all of those involved were on the ground within ten to twenty

26 seconds, with no video clearly depicting each person's every action. (Doc. No. 160-5, Exhibit 7,

27 /////

28 /////

1  Video 00:24–00:41; Exhibit 8, Video 00:32–00:42.)[11]  Once on the ground, the videos clearly

2  capture some exercise of force, such as the officers handcuffing plaintiff, Officer Aspegren's

3  hand pushing plaintiff's face into the ground, and Officer Aspegren's knee on plaintiff's neck.

4  (Doc. No. 160-5, Exhibit 5, Video 06:44–07:12; Exhibit 7, Video 01:18–01:33.)  However, the

5  videos do not clearly depict the entirety of events prior to the arrest and before plaintiff was taken

6  to the ground, nor the entirety of the arrest once plaintiff was on the ground.  (Doc. No. 160-5,

7  Exhibit 8, Video 00:40–03:43.)  At his deposition, plaintiff testified regarding the force used,

8  describing that after being asked twice for identification, "one guy went to [his] arm" and the

9  other "guy went straight to try to tackle [him]."  (Doc. No. 164 at 58.)  Plaintiff testified that he

10  "didn't do nothing, didn't show a single strength, didn't fight not a single nothing.  Everything

11  that you see, that was them doing."  (*Id*. at 59.)  Plaintiff testified that the officers "yank[ed] on

12  his arm before they took [him] to the ground."  (*Id*. at 61.)  Plaintiff also testified that once taken

13  down, his "head hit the ground," that "they really slid my face on the concrete," and that he

14  "recall[ed] them rubbing [his] face into the ground" and "sliding [his] face on the concrete."

15  (Doc. No. 164 at 53, 68.)

16      On the other hand, officer Aspegren testified at deposition that he "grab[bed] [plaintiff's]

17  arm" "to put him in a wrist lock," and that plaintiff resisted arrest by flexing his arm muscle.

18  (Doc. No. 164 at 148, 154–55.)  Officer Cano testified that plaintiff "physically resist[ed]" and

19  "was actively resisting," but he could not recall any ways in which plaintiff actively resisted.  (*Id*.

20  at 182, 211.)

21      The court finds that there is a genuine dispute of fact as to whether plaintiff physically

22  resisted at all, which, as an issue of fact, must be resolved by a jury.  *See Noble-Perez*, 2023 WL

23  6194265, at *14 ("Similarly, when viewing the evidence in the light most favorable to the non-

24  moving party, Noble-Perez did not resist Robinson's attempt to handcuff him.  Because this is the

25  _____

26  [11]  The court notes that after Officer Cano reached for plaintiff's arms, his body-worn camera
   recorded almost none of the rest of the interaction with plaintiff.  Rather, the camera view is

27  obscured by the ground or by a hand (Doc. No. 160-5, Exhibit 8, Video 00:40–02:18) before it
   appears that the camera is placed on the ground and pointed at the sky, seemingly disconnected

28  from the officer's body (*Id*. at 02:18–3:43).  Thereafter, the video cuts out completely.

1  basis of Robinson's justification in using force, the existence of a factual dispute on the issue

2  precludes a grant of summary judgment.  The Court concludes these issues of fact are more

3  appropriately resolved by a jury."); *Smith*, 394 F.3d at 703 (considering the limited evidence

4  suggesting that the plaintiff actively resisted arrest, among other evidence, and concluding that

5  "whether the force used here was reasonable is a matter that cannot be resolved in favor of the

6  defendants on summary judgment"), *disapproved of on other grounds by Lemos v. Cnty. of*

7  *Sonoma*, 40 F.4th 1002 (9th Cir. 2022).  Accordingly, the court cannot conclude that the *Graham*

8  factors warrant the granting of summary judgment in favor of defendants.  *See Porter v. Cnty. of*

9  *Solano*, No. 2:21-cv-01473-KJM-JDP, 2025 WL 621545, at *16 (E.D. Cal. Feb. 26, 2025)

10  (balancing the *Graham* factors and concluding that "[t]he court cannot decide as a matter of law if

11  defendants used excessive force because there are material disputes about [the plaintiff's] level of

12  resistance, if any"), *appeal pending*.

13          e.    *Qualified Immunity*

14         Defendants also argue that they are entitled to qualified immunity as to their use of force

15  because they did not violate clearly established law.  (Doc. No. 160-1 at 26.)  As to defendants

16  Aspegren and Cano, defendants argue that "there is no case on point that says" that officers

17  cannot use wrist locks, arm bar takedowns, and other nondeadly force in response to active

18  resistance.  (*Id*. at 27.)  As to defendant Postolaki, defendants argue that he "was not an arresting

19  officer and only provided limited assistance in placing the Plaintiff in handcuffs" and "[t]here is

20  no case law that on point that holds an officer that aids fellow officers in effectuating an arrest . . .

21  has violated the arrestees [sic] constitutional rights."  (*Id.* at 28.)

22         First, the court is not persuaded by defendants' argument that defendant Postolaki is

23  entitled to qualified immunity on the basis of his limited role in the use of force against plaintiff.

24  The body-worn camera footage before the court on summary judgment shows that defendant

25  Postolaki ran over to plaintiff and the other officers while defendant Officer Cano had an arm

26  wrapped around plaintiff's neck and appeared to still be in the process of taking plaintiff to the

27  ground.  (Doc. No. 160-5, Exhibit 5, Video 06:28–06:33.)  Defendant Postolaki immediately

28  began giving orders to the other officers, before plaintiff had even reached the ground, such as

1   "Let's get him on his stomach" and "Let's turn him over." (*Id.* at 06:33–06:38.) He then tells

2   plaintiff several times to "Give me your arm," and the evidence establishes that defendant

3   Postolaki is the officer who physically maneuvered plaintiff's arms backwards for the purposes of

4   handcuffing despite plaintiff's continued objections that his "arm is broke" and he "can't bend it."

5   (*Id.* at 06:38–07:17.) On the basis of this evidence of defendant Postolaki's involvement in the

6   use of force on plaintiff, defendant Postolaki is not entitled to summary judgment on qualified

7   immunity grounds due to his "limited" involvement in the use of force.

8          Second, the court is also not persuaded by defendants' arguments as to defendants

9   Aspegren and Cano, because there is a genuine dispute of material fact as to plaintiff's level of

10  physical resistance to the officers during this interaction. Viewing the facts in the light most

11  favorable to plaintiff, the evidence on summary judgment could be viewed as establishing that he

12  offered little to no threat or resistance to the officers that would justify the force used in arresting

13  him. Further, at the time of plaintiff's arrest, "[t]he right to be free from the application of non-

14  trivial force for engaging in mere passive resistance" was clearly established. *Gravelet-Blondin v.*

15  *Shelton*, 728 F.3d 1086, 1093 (9th Cir. 2013); *see also Headwaters Forest Def. v. Cnty. of*

16  *Humboldt*, 276 F.3d 1125, 1130–31 (9th Cir. 2002), *as amended* (Jan. 30, 2002) (reversing the

17  district court's grant of summary judgment on qualified immunity grounds, finding that the use of

18  force on protestors, whom the defendants claimed were actively resisting but in the light most

19  favorable to the protestors "were sitting peacefully," "was plainly in excess of the force necessary

20  under the circumstances, and no reasonable officer could have concluded otherwise"). It was also

21  clearly established that refusing to comply with an officer's command is passive and not active

22  resistance. *See Thomas*, 818 F.3d at 890 (holding that plaintiff resisted "passively and not

23  actively" when he moved backward to avoid the officer's attempt to grab him and did not comply

24  with commands); *see also Rice v. Morehouse*, 989 F.3d 1112, 1127 (9th Cir. 2021) (noting that

25  "*Gravelet-Blondin* clearly established the law" and that the plaintiff was "engaged in mere

26  passive resistance" when he "repeatedly declined to provide his license"). To the extent that

27  plaintiff was "tackled," or taken to the ground, and had pressure applied to his neck and face,

28  those are clearly methods of "non-trivial force." *Blankenhorn*, 485 F.3d at 478 (finding that, if a

1    jury were to find the disputed facts in the plaintiff's favor, the defendants "would probably be

2    liable for excessive force" for tackling him and "shoving a knee into the back of his neck"); *see*

3    *also Wallace v. City of Fresno*, No. 1:19-cv-01199-AWI-SAB, 2022 WL 2110682, at *14 (E.D.

4    Cal. June 10, 2022) (denying qualified immunity where the defendant officers punched, tackled,

5    or struck the plaintiff, noting that in *Gravelet-Blondin* the Ninth Circuit clearly held that officers

6    use excessive force when they use non-trivial force on passively resisting individuals); *Hulet v.*

7    *Cnty. of Tuolumne*, No. 1:23-cv-01217-KES-HBK, 2025 WL 1117054, at *5 (E.D. Cal. Apr. 14,

8    2025) ("The Ninth Circuit has repeatedly held that take-down maneuvers may constitute a

9    'substantial' or 'significant' amount of force.").

10        Because defendants' entitlement to qualified immunity ultimately depends on disputed

11    factual issues regarding the force used by the officers during the arrest of plaintiff, as well as

12    plaintiff's level of resistance, if any, summary judgment in defendants' favor on their affirmative

13    defense of qualified immunity is not appropriate. *See Santos*, 287 F.3d at 854 (noting that

14    deciding the qualified immunity issue would be premature before the jury resolves disputed facts

15    as to how much force was used and whether that amount was excessive, where the defendant

16    officer took "a passive individual to the ground with force sufficient to break his" vertebra); *see*

17    *also S.R. Nehad v. Browder*, 929 F.3d 1125, 1140 (9th Cir. 2019) ("[W]hen there are disputed

18    factual issues that are necessary to a qualified immunity decision, these issues must first be

19    determined by the jury before the court can rule on qualified immunity.").

20        3.    *Monell* Liability (Claim Five)

21        A municipality may be liable under § 1983 where the municipality itself causes the

22    constitutional violation through a "policy or custom, whether made by its lawmakers or those

23    whose edicts or acts may fairly be said to represent official policy." *Monell v. Dep't of Soc.*

24    *Servs.*, 436 U.S. 658, 694 (1978). The Ninth Circuit has recognized four theories for establishing

25    municipal liability under *Monell*: "(1) an official policy; (2) a pervasive practice or custom; (3) a

26    failure to train, supervise, or discipline; or (4) a decision or act by a final policymaker." *Horton*

27    *by Horton v. City of Santa Maria*, 915 F.3d 592, 602–03 (9th Cir. 2019). "Cases often refer to the

28    /////

1    fourth theory as 'ratification' by a final policymaker." *Thurston v. City of Vallejo*, No. 2:19-cv-

2    01902-KJM-CKD, 2021 WL 1839717, at *3 (E.D. Cal. May 7, 2021).

3         "[A] custom or practice can be inferred from widespread practices or evidence of repeated

4    constitutional violations for which the errant municipal officers were not discharged or

5    reprimanded." *Hunter v. Cnty. of Sacramento*, 652 F.3d 1225, 1233 (9th Cir. 2011) (citations and

6    internal quotations omitted); *see also Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir.

7    2005); *Gillette v. Delmore*, 979 F.2d 1342, 1349 (9th Cir. 1992) ("A section 1983 plaintiff may

8    attempt to prove the existence of a custom or informal policy with evidence of repeated

9    constitutional violations for which the errant municipal officials were not discharged or

10   reprimanded."); *McRorie v. Shimoda*, 795 F.2d 780, 784 (9th Cir. 1986) ("Policy or custom may

11   be inferred if, after the shakedown, the prison officials took no steps to reprimand or discharge

12   the guards, or if they otherwise failed to admit the guards' conduct was in error.").

13        "[A] municipality's failure to train its employees in a relevant respect must amount to

14   'deliberate indifference to the rights of persons with whom the [untrained employees] come into

15   contact.'" *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quoting *City of Canton v. Harris*, 489

16   U.S. 378, 388 (1989)). "A pattern of similar constitutional violations," rather than proof of a

17   single incident, is "'ordinarily necessary' to demonstrate deliberate indifference." *Id.* at 62–63

18   (citations omitted).

19        In the court's previous order resolving defendants' motion to dismiss plaintiff's third

20   amended complaint, it observed that plaintiff "appears to allege two theories for his *Monell*

21   claim:" "(i) defendants have engaged in an allegedly unconstitutional policy or custom of

22   arresting, through the use of excessive force, and charging suspects when those suspects refuse to

23   provide their identification when requested by police; and (ii) defendants have failed to

24   adequately train officers in de-escalation techniques or failed to hire officers trained in such de-

25   escalation techniques." (Doc. No. 126 at 14.) The court granted plaintiff leave to amend his

26   *Monell* claim as predicated on an unconstitutional policy or custom for the limited purpose of

27   alleging "instances of excessive use of force generally similar to what plaintiff is alleged to have

28   suffered." (*Id.* at 20.) The court also granted plaintiff leave to amend as to his failure to train

32

1  *Monell* liability theory to "add additional incidents of failure to train" but warned plaintiff that

2  "he must—at minimum—allege more than two incidents that predate the incident involving

3  plaintiff to be considered plausible notice to defendant City of Vallejo that there was a failure to

4  train." (*Id.* at 22.) Plaintiff amended his complaint, but did not include any allegations of other

5  instances as the court instructed.[12]

6      In the pending motion for summary judgment, defendants argue that while plaintiff

7  "alleges a litany of possible policies" in his 4AC, "plaintiff has failed to develop evidence of prior

8  unconstitutional acts, policies or procedures leading to a constitutional violation, or any

9  ratification of prior unconstitutional behavior, sufficient to prove any *Monell* theory of liability."

10  (Doc. No. 160-1 at 30.) Defendants also argue that there is no evidence before the court on

11  summary judgment that the City of Vallejo was on notice about a particular omission in its

12  training programs. (*Id.*) In opposition, plaintiff's only response to defendants' challenge to his

13  *Monell* claim is the following:

14          Plaintiff has evidence that both the city of Vallejo and VPD allowed
           officers to lie on police reports regarding use of force (like the way
15          Defendant Cano did).

16          VPD knew or should have known that all defendant officers are not
           well versed in how to conduct a Terry stop or a Terry like stop.
17

18          VPD has publicly posted a correction to all of the issues Mr. Lake
           has brought up on his Monell claims.

19          VPD has hired a consultant group called OIR Group to help address
           the issues Mr. Lake has brought up in the Monell aspect of the 5th
20          Cause of Action.

21  (Doc. No. 163 at 9.) In reply, defendants observe that plaintiff "provides neither case law nor

22  citations to evidence in the record that any City of Vallejo or Vallejo Police Department policies

23  or failures to train were the cause of Plaintiff's claimed injuries" and fails to raise a triable issue

24  as to a policy allowing officers to lie on police reports. (Doc. No. 167 at 8.)

25      The court agrees that plaintiff's opposition directs the court to no evidence in support of

26  his conclusory argument on this point and is clearly lacking factual detail or sufficient analysis

27  _____

28  [12] Defendants did not move to dismiss plaintiff's *Monell* claim again, so the action currently
    proceeds on plaintiff's *Monell* claim as stated in the 4AC.

1   upon which the court could find a triable issue of fact as to any basis for his *Monell* claim.

2   However, the court notes that shortly after plaintiff filed his opposition, he also submitted the

3   declaration of attorney Chau, and two requests for judicial notice (Doc. Nos. 165, 166).  In

4   plaintiff's requests for judicial notice, he asks that the court take judicial notice of the following

5   seven documents:  (i) Exhibit H:  "the Complaint for Injunctive Relief filed by AG Rob Bonta

6   against City of Vallejo and its police department" in Solano County Superior Court, Case No.

7   CU-23-04676; (ii) Exhibit I:  Office of Independent Review Group Vallejo Interim Auditor

8   Implementation Plan; (iii) Exhibit J:  *Attorney General Bonta Announces Stipulated Judgment*

9   *with the Vallejo Police Department to Strengthen Accountability, Police Policies and Practices*,

10  OAG.CA.gov (October 15, 2023); (iv) Exhibit K:  *Vallejo City Council approves $900k*

11  *settlement in Vallejo Police Department's Badge Bending Whistleblower Case*,

12  kilgorenewsherald.com (Sept. 15, 2023); (v) Exhibit L:  OIR Group Report: Independent

13  Assessment of Operations, Internal Review Systems, and Agency Culture, vallejopd.net;

14  (vi) Exhibit M:  VPD Implementation Plan; and (vii) Exhibit N:  Proposed VPD Improvement

15  Plan.  In her declaration, attorney Chau states that these documents "show that DOJ filed lawsuit

16  against City of Vallejo and VPD after investigation into series of complaints against VPD for

17  unreasonable force" and are "proof that there are internal police problems and VPD upper

18  management acknowledges that they for years have knowingly known that their officers violated

19  the 4th amended [sic] rights, failure to train their officers, and volunteer to improve training."

20  (Doc. No 164 at 5.)  Defendants filed no response or opposition to plaintiff's requests for judicial

21  notice.[13]

22      The court will grant plaintiff's request for judicial notice as to Exhibit H, the complaint

23  filed in Solano County Superior Court, Case No. CU-23-04676, finding that filings in state court

24  proceedings are "proper subjects of judicial notice."  *Leramo v. Wells Fargo Bank, N.A.*, No.

25  1:19-cv-00090-DAD-JLT, 2019 WL 1651268, at *4 (E.D. Cal. Apr. 17, 2019); *Fid. Nat'l Title*

---

[13]  The court notes that it would be justified in *sua sponte* "strik[ing] plaintiff['s] late-filed
request[s] for judicial notice as impermissible supplemental briefing," but declines to exercise its
discretion to do so.  *Lee v. City of Los Angeles*, No. 13-cv-01410, 2015 WL 12748244, at *3
(C.D. Cal. Feb. 24, 2015).

1    *Co. v. U.S. Small Bus. Admin.*, No. 2:13-cv-02030-KJM-AC, 2015 WL 7077407, at *3 (E.D. Cal.

2    Nov. 13, 2015) ("Each filing relates to this litigation and is a public document whose accuracy is

3    not subject to reasonable dispute."). However, the court does not assume the truth of the

4    allegations in this document; only that the document "says what it says." *Jacquett v. Sisto*, No.

5    06-cv-02938-RRB-EFB (PC), 2008 WL 1339362, at *1 (E.D. Cal. Apr. 9, 2008). As to the news

6    articles in Exhibits J and K, the court will also "take[] judicial notice of the existence of the

7    internet articles and the fact that the articles contain the referenced content, but cannot take

8    judicial notice of the truth of the contents therein." *Woodall v. Walt Disney Co.*, No. 20-cv-

9    03772-CBM-E, 2024 WL 5337348, at *3 (C.D. Cal. Nov. 1, 2024); *see also Gerritsen v. Warner*

10   *Bros. Ent. Inc.*, 112 F. Supp. 3d 1011, 1029 (C.D. Cal. 2015) ("[T]o the extent the court can take

11   judicial notice of press releases and news articles, it can do so only to indicate what was in the

12   public realm at the time, not whether the contents of those articles were in fact true.") (citation

13   omitted).

14        As to the Implementation or Improvement Plans in Exhibits I, M, and N, and the report

15   submitted as Exhibit L, the court observes that plaintiff has offered little information about the

16   source of these documents, other than to provide a website link to a filesharing platform and a

17   broken, nonfunctioning link to the Vallejo Police Department Website. Federal Rule of Evidence

18   201(b)(2) requires that a court may judicially notice a fact that is not subject to reasonable dispute

19   because it "can be accurately and readily determined from sources whose accuracy cannot

20   reasonably be questioned." Given the lack of information provided by plaintiff's counsel,

21   including as to dates, authors, or sources, the accuracy of all four of these documents is subject to

22   some question. However, each document does reflect the insignia of the Vallejo Police

23   Department, and defendants have not contested the contents or source of any of these documents.

24   Accordingly, the court will also take judicial notice of the existence of these documents, but not

25   the truth of their contents. *See United States v. Kane*, No. 2:13-cr-00250-JAD-VCF, 2013 WL

26   5797619, at *11 (D. Nev. Oct. 28, 2013) (finding that the court could take limited judicial notice

27   of a motorcycle club's website because its contents were not contested, and the site was not being

28   offered for its truth).

1      Beyond asking the court to take judicial notice of these documents, plaintiff does little to

2  explain how these documents lend support to his *Monell* claim, and he provides no pin cites to

3  direct the court to any particular pages of these documents that may reflect relevant evidence on

4  summary judgment.  The court can also make little sense of what, if any, legal analysis counsel

5  for plaintiff is attempting to communicate within her largely incoherent declaration.  (Doc. No.

6  164 at ¶¶ 14–22.)  Further, the court observes that despite its previous guidance to plaintiff that a

7  *Monell* claim must be supported by evidence of instances "generally similar to what plaintiff is

8  alleged to have suffered," there are no such instances described in the documents that plaintiff has

9  submitted.  The complaint in Exhibit H and the article in Exhibit J reflect no information or

10  allegations of any specific instances of excessive force or police misconduct.  (Doc. No. 165 at 6–

11  13; 45–50.)  The article in Exhibit K concerns the practice of officers "fir[ing their] weapons at

12  civilians," but no such similar conduct related to the use of weapons is at issue in this case.  (Doc.

13  No. 165 at 52–55.)  The plans and reports in Exhibits I, L, M, and N contain general information

14  regarding the City of Vallejo's policing challenges, recruitment efforts, workload, headquarters

15  location, body-worn camera policies, and other information, but no references to conduct of

16  police officers as alleged by plaintiff in this case.  The court simply has not identified anything to

17  support plaintiff's argument that he "has evidence that both the city of Vallejo and VPD allowed

18  officers to lie on police reports regarding use of force" and that "VPD knew or should have

19  known that all defendant officers are not well versed in how to conduct a *Terry* stop."  (Doc. No.

20  163 at 9.)

21      Accordingly, the court concludes that plaintiff has failed to develop and present any

22  evidence to support his *Monell* claim and will grant summary judgment on this claim in

23  defendants' favor.  *See Hutton v. City of Berkeley Police Dep't*, No. 13-cv-03407-JCS, 2014 WL

24  4674295, at *14 (N.D. Cal. Sept. 9, 2014) ("In this case, Plaintiff has not offered any evidence

25  showing a pattern of constitutional violations.  Rather, the only evidence in the record relates to

26  the alleged unconstitutional acts in this case.  Such evidence does not suffice to establish *Monell*

27  liability."); *Campbell v. City of Milpitas*, No. 13-cv-03817-BLF, 2015 WL 1359311, at *12 (N.D.

28  Cal. Mar. 25, 2015) (granting the defendant city's motion for summary judgment on the

1    plaintiff's *Monell* claim, noting that because the plaintiff's *Monell* claim was properly challenged

2    on summary judgment, the plaintiff must "designate specific facts demonstrating the existence of

3    genuine issues for trial," but the "[p]laintiffs' opposition brief does not address the City's motion

4    on the *Monell* claim").

5            4.      Battery Claim (Claim Eight)

6        To prevail on a claim for battery against a law enforcement officer, the plaintiff bears the

7    burden of proving the officer used excessive force. *Edson v. City of Anaheim*, 63 Cal. App. 4th

8    1269, 1273–74 (1998); *see also Johnson v. Cnty. of Los Angeles*, 340 F.3d 787, 794 (9th Cir.

9    2003); *Saman v. Robbins*, 173 F.3d 1150, 1157 n.6 (9th Cir. 1999). An officer's use of excessive

10   force is analyzed under the Fourth Amendment's reasonableness standard. *Munoz v. City of

11   Union City*, 120 Cal. App. 4th 1077, 1102 & n.6 (2004) ("Federal civil rights claims of excessive

12   force are the federal counterpart to state battery and wrongful death claims; in both, the plaintiff

13   must prove the unreasonableness of the officer's conduct."), *modified on denial of reh'g* (Aug.

14   17, 2004) (citing *Graham*, 490 U.S. at 395 and *Edson*, 63 Cal. App. 4th at 1274); *see also

15   Johnson*, 340 F.3d at 794 (holding a state law claim of assault and battery depends on the

16   reasonableness of the force used by defendant officer).

17       Here, defendants argue that since plaintiff's Fourth Amendment claim for excessive force

18   fails, "his battery claim similarly fails." (Doc. No. 160-1 at 28.) Because, as outlined above,

19   genuine disputes of material fact exist precluding summary judgment as to the reasonableness of

20   the force used by the defendant officers against plaintiff, defendants' motion for summary

21   judgment on this ground with respect to plaintiff's battery claim will be denied as well.

**CONCLUSION**

23       For the reasons explained above,

24   1.      Defendants' motion for summary judgment (Doc. No. 160) is GRANTED in part

25           and DENIED in part as follows:

26           a.      Defendants' motion for summary judgment as to plaintiff's first claim for

27                   an unlawful stop in violation of the Fourth Amendment brought under 42

28                   U.S.C. § 1983 against defendant Postolaki is GRANTED;

1        b.      Defendants' motion for summary judgment in their favor as to plaintiff's

2                third claim for excessive use of force in violation of the Fourth

3                Amendment brought under 42 U.S.C. § 1983 against defendants Aspegren,

4                Cano, Postolaki, and Nichols is GRANTED as to defendant Nichols and

5                DENIED as to defendants Aspegren, Cano, and Postolaki;

6        c.      Defendants' motion for summary judgment in their favor as to plaintiff's

7                fourth claim for an unlawful arrest in violation of the Fourth Amendment

8                brought under 42 U.S.C. § 1983 against defendants Aspegren, Cano,

9                Postolaki, and Nichols is GRANTED as to defendant Nichols and

10               DENIED as to defendants Aspegren, Cano, and Postolaki;

11       d.      Defendants' motion for summary judgment in their favor as to plaintiff's

12               fifth claim against defendants City of Vallejo and the City Council of the

13               City of Vallejo, brought as a § 1983 *Monell* claim, is GRANTED;

14       e.      Defendants' motion for summary judgment in their favor as to plaintiff's

15               eighth claim for common law battery against defendants Aspegren, Cano,

16               Postolaki, Nichols, and City of Vallejo is GRANTED as to defendant

17               Nichols and otherwise DENIED;

18   2.   Plaintiff's requests for judicial notice (Doc. Nos. 165, 166) are GRANTED as

19        explained in this order;

20   3.   Plaintiff's request for leave to amend his fourth amended complaint is DENIED;

21   4.   This action now proceeds only on the following claims:

22       a.      Plaintiff's third claim for excessive force in violation of the Fourth

23               Amendment brought under 42 U.S.C. § 1983 against defendants Aspegren,

24               Cano, and Postolaki;

25       b.      Plaintiff's fourth claim for unlawful arrest in violation of the Fourth

26               Amendment brought under 42 U.S.C. § 1983 against defendants Aspegren,

27               Cano, and Postolaki; and

28   /////

c.      Plaintiff's eighth claim for common law battery against defendants Aspegren, Cano, Postolaki, and the City of Vallejo;

5.    The Clerk of the Court is directed to UPDATE the docket to reflect that defendant Nichols and defendant City Council of the City of Vallejo are TERMINATED as defendants; and

6.    The parties are directed to meet and confer on their availability, and within fourteen (14) days of the docketing of this order, to contact Courtroom Deputy Pete Buzo at (916) 930-4016 or pbuzo@caed.uscourts.gov with several proposed dates for the rescheduling of a Final Pretrial Conference and Jury Trial in this action.

IT IS SO ORDERED.

Dated:  **June 20, 2025**

DALE A. DROZD
UNITED STATES DISTRICT JUDGE

39